# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| REEDS JEWELERS OF NIAGARA FALLS, INC., on Behalf of Itself and All Others Similarly Situated,<br><br>        Plaintiff,<br><br>vs.<br><br>CINCINNATI INSURANCE COMPANY,<br>c/o Steve Corbly, Statutory Agent<br>P.O. Box 145496<br>Cincinnati, Ohio 45250-5496<br><br>        Defendant. | Case No. 1:20-cv-649<br><br>**CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Reeds Jewelers of Niagara Falls, Inc. ("Reeds"), individually and on behalf of all other similarly situated entities (collective, the "Class"), bring this class action against defendant Cincinnati Insurance Company ("Cincinnati").

## NATURE OF ACTION

1. This is a class action for breach of contract and declaratory and injunctive relief arising from Cincinnati's refusal to pay COVID-19-related claims as required by its insurance policies it sold to plaintiff and other policyholders.

2. According to the National Association of Insurance Commissioner's database, Cincinnati collects over $1.2 billion per year in annual premiums for commercial insurance, including business interruption policies. Insurance companies collected net premiums of $1.22 trillion nationwide in 2018, with 51 percent of that amount collected by property/casualty insurers, according to the Insurance Information Institute.

3.     Plaintiff Reeds owns and operates seven jewelry and watch retail outlets in New York State, as well as one store in Massachusetts. In response to New York State and local county mandates, and COVID-19, Reeds's New York stores were closed from March 22, 2020 until June 2, 2020, resulting in a loss of sales in excess of $3 million.

4.     Reeds purchased an all-risk commercial property insurance policy from Cincinnati to indemnify it for business income lost due to the shutdown of its operations. The current policy is in effect from August 1, 2019, through August 1, 2020. Reeds paid thousands in annual premiums for the policy for $7,758,500 million in coverage under the policy, with 12 months of business income loss coverage, and 30 days of civil authority coverage.

5.     Yet, despite plaintiff's claim for payment under the policy to cover these losses to its income, defendant has refused to provide the protection that plaintiff purchased, citing policy exclusions and coverage defenses that do not apply and which have no merit. Moreover, plaintiff is not unique. The reasons given by Cincinnati to deny coverage are written in terms that appear designed to deny coverage to all claims under these form contracts, even though the policy it drafted does not contain an applicable exclusion for losses caused by the Closure Orders and COVID-19 (as described more particularly below).

6.     On March 11, 2020, the World Health Organization (WHO) issued an announcement declaring that COVID-19 had become a pandemic. On March 16, 2020, the United States issued new guidelines urging avoidance of gatherings of more than ten people, and states, counties and cities across the nation began announcing widespread business shutdown and stay-at-home orders, including orders issued by the State of New York and all five New York counties in which Reeds has a location. As of the date of filing of this complaint, more than 3.8 million people were

confirmed to have been infected with COVID-19 in the United States, with over 141,000 deaths reported nationwide, according to the United States Centers for Disease Control and Prevention ("CDC").

7. COVID-19 is caused by a novel coronavirus now known as Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2). It is a physical virus that is spread and transmitted through the air and contact with surfaces of property. While the virus reportedly originated in China, the rapid transmission of COVID-19 has resulted in the United States alone in an exponential increase in the number of cases to about forty times the number of reported cases and thirty times the number of reported deaths in mainland China. (In this complaint, plaintiff refers to both the virus and the resulting diseases as COVID-19.)

8. The virus easily disseminates among humans through respiratory droplets, which are produced by coughing, sneezing and talking, and through aerosols, which are released during breathing. It can also spread through contact with an object or surface containing the virus. Infected aerosols can remain suspended for hours in the air and for days on objects and surfaces, potentially infecting someone who unwittingly touches an infected object or surface and then touches his or her face.

9. As of April 1, 2020, the United States and every state in the Union had issued emergency declarations relating to COVID-19, and by mid-April 95% of the population of the United States was under one or more state or local directives to, among other things, refrain from close contact with other persons. While some of these orders and declarations were lifted, the re-acceleration of COVID-19 cases in late spring and early summer has led 22 states to pause or reverse their reopening processes as of July 22, 2020.

3

10. The closure orders typically ordered the shutdown of businesses deemed "non-essential" and prohibited in-person services to be provided on their premises. Businesses deemed "essential" have also been heavily impacted by the closure orders. For example, businesses deemed to be essential have had to cease in-person services (such as dining in a restaurant), adjust cleaning protocols, limit hours, install barriers between employees and customers, and supply employees with personal protective equipment. Many of these business have been unable to keep employees at work on their premises because of their fear of becoming infected.

11. New York State issued business shut down and closure orders, and all five counties in which Reeds has an insured location have issued state of emergency declarations related to the COVID-19 pandemic to help enforce the state's shut down and closure order ("Closure Orders"). These Closure Orders have caused the suspension of operations by both non-essential and essential businesses, including the complete shut down of all seven of Reeds' New York stores.

12. The first case of COVID-19 in New York was reportedly confirmed on March 1, 2020, with the first case in western New York reportedly confirmed in Monroe County on March 12, 2020. Subsequent cases were confirmed in Erie County and Niagara County on March 15 and 16, 2020 respectively. Plaintiff maintains at least one store in all three counties. New York State remained open for business for ten days after the first cases in Monroe County and about a week after cases were confirmed in Erie and Niagara Counties. Given that it takes up to fourteen days to develop symptoms after infection, people infected by the virus, or who had contact with other infected people, have likely visited plaintiff's place of business, and insured businesses across the country, and thereby contaminated plaintiff's and surrounding property with the virus by the time of the Closure Orders, and thereafter. By March 20, 2020, there was a known risk that surfaces of

4

physical property located in businesses nationwide were potentially infected, and that risk, among others, prompted the Closure Orders, as acknowledged in those orders.

13. The transmission of COVID-19 and the Closure Orders have adversely impacted plaintiff's business and the businesses of other class members. For example, customers could not access plaintiff's places of business due to the Closure Orders or the fear of being infected with COVID-19. Suppliers to businesses have also been adversely impacted by the Closure Orders and COVID-19.

14. But plaintiff, like other businesses, prudently prepared for an unexpected event like the COVID-19 pandemic. Specifically, plaintiff purchased insurance from defendant, under Policy No. ECP0498814 (the "Policy"), that did not exclude coverage for income loss caused by a virus.

15. The policy protected plaintiff from business income losses at its retail jewelry stores at the following locations:

- 150 Creekside Dr., Amherst, New York 14228;

- 1401 Military Road, Niagara Falls, New York 14304;

- 4001 Maple Road, Amherst, New York 14226;

- 3515 Abbott Road, Orchard Park, New York 14127;

- 3500 Erie Blvd., DeWitt, New York 13214;

- 361 E. Fairmont Ave, Lakewood, New York 14750; and

- 1669 Pittsford Victor Rd., Fairport, New York 14450.

(Collectively, "Insured Premises").

16.  The Insured Premises collectively generate between $15 million to $20 million in sales annually.

17.  The Policy contains several forms and endorsements that define the scope of coverage. Upon information and belief, the forms and endorsements used in plaintiff's Policy are materially the same as policies held by the members of the Class.

18.  The Policy provides coverage for:

   a.  Business income losses sustained due to the necessary suspension of operations ("Business Income" coverage)

   b.  Expenses incurred to minimize the suspension of business and to continue operations after a suspension of business ("Extra Expense" coverage)

   c.  Interruption of business caused by an order from a civil authority ("Civil Authority" coverage)

19.  In addition, the Policy requires plaintiff "[i]n the event of 'loss' to Covered Property" to "[t]ake all reasonable steps to protect the Covered Property from further damage." In this instance, this required plaintiff to suspend operations to reduce the risks of infection by COVID-19 and the contamination of "Covered Property" and further injury that would be occasioned by the spread of COVID-19 at plaintiff's place of business. Had plaintiff *not* suspended operations, plaintiff would have been in breach of its duties under the Policy.

20.  On or about April 29, 2020, Reeds initiated a claim with Cincinnati for interruption of business and loss of business income as a result COVID-19. This claim was assigned Claim No. 3544732.

21.  On May 21, 2020, Cincinnati issued a denial letter to Reeds regarding this claim. This

denial letter does not detail or otherwise show findings from any investigation, but rather consists almost entirely of Cincinnati's self-serving interpretations of its own policy language.

22.   Defendant has caused substantial harm to Plaintiff and members of the proposed class by wrongfully refusing coverage under the Policy and other Policies.

23.   On behalf of itself and the Class, Plaintiff seeks to recover damages for breach of contract, as well as declaratory and injunctive relief.

## PARTIES

24.   Plaintiff Reeds Jewelers of Niagara Falls, Inc. is a business entity incorporated under the laws of the State of New York.  Reeds' principal place of business is located at 150 Creekside Dr., Amherst, New York 14228.

25.   Defendant Cincinnati Insurance Company is a corporation incorporated under the laws of the State of Ohio. Cincinnati's principal place of business at 6200 S. Gilmore Road, Fairfield, Ohio 45014. Cincinnati is a duly licensed insurance company authorized to transact business in the State of New York.

## JURISDICTION AND VENUE

26.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from defendant, the amount in controversy exceeds $5 million, exclusive of interest and costs, and the proposed class contains more than 100 members.

27.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the sole defendant is headquartered in Fairfield, Ohio, which is located within this district.

## FACTUAL BACKGROUND

**A. The Physical Transmission of the Virus Through Air and Surfaces**

28.    According to the CDC, COVID-19 can spread by respiratory droplets when an infected person talks, sneezes, or coughs, and can also be spread through contact with surfaces touched or breathed on by an infected person.  According to several studies, the virus can live on surfaces for several days.

29.    Coronaviruses are not new. The name comes from the crown-like appearance of the array of spikes around the enveloped virion.  Coronaviruses are responsible for approximately 25% of human colds of all age groups. The SARS-CoV-2 disease that spread from southern China in 2002 is a coronavirus. Prior studies have shown that coronaviruses have been detected on surfaces of physical objects located in a wide array of public spaces and businesses, including hospitals, daycare centers, offices, and restaurants. Studies found that SARS-CoVs have retained their infectivity for up to nine days on surfaces. And studies have shown that coronaviruses can live for up to eight days on produce, such as lettuce, and can be recovered from lettuce with an efficiency of 19.6%.

30.    In an article posted on the National Institute of Health's website on March 24, 2020, the NIH stated that "[v]iruses can live for a time on surfaces outside the human body. According to the CDC, it may be possible to contract the virus responsible for the current outbreak, SARS-CoV-2, by touching a surface or object with the virus on it and then touching your face."

31.    When frozen, viruses can survive up to two years and can travel across the globe undetected. In August 2020, Chinese authorities found samples of COVID-19 on the surface of frozen chicken wings imported from Brazil and the outer packaging of frozen shrimp imported

8

from Ecuador. Likewise, New Zealand authorities are investigating whether the recent COVID-19 outbreak in Auckland—which ended the country's 102-day streak without any community transmission of COVID-19—stemmed from the surface of imported frozen food containers due to multiple of the first cases being traced to workers at a frozen food warehouse.

32.    In addition, studies have reported that COVID-19 has been detected in the air. The NIH article reported that a study published in the *New England Journal of Medicine* found that aerosols containing the virus remained highly infectious in the air for at least 3 hours.  In that study, published on March 17, 2020, Researchers led by Dr. Vincent Munster of NIH's National Institute of Allergy and Infectious Diseases studied how long the virus survives in the air and on surfaces. The researchers reported that the COVID-19 virus remained infectious on plastic and stainless steel surfaces for two to three days, and it remained infectious for up to 24 hours on cardboard surfaces. The study found that "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…." The NIH, reporting on the study, stated that the "results suggest that people may acquire SARS-CoV-2 through the air and after touching contaminated objects."

33.    These air and surface transmissions are made possible in part because COVID-19 transmits through aerosols.  The American Association for the Advance of Science's prestigious magazine *Science* recently published an article by Dr. Kimberly Prather, who found that COVID-19 transmits through aerosols – which are produced by normal breathing – and through surfaces on which the aerosol particles land. She reported

Respiratory infections occur through the transmission of virus-containing droplets (>5 to 10 μm) and aerosols (≤5 μm) exhaled from infected individuals during

breathing, speaking, coughing, and sneezing. Traditional respiratory disease control measures are designed to reduce transmission by droplets produced in the sneezes and coughs of infected individuals. However, a large proportion of the spread of coronavirus disease 2019 (COVID-19) appears to be occurring through airborne transmission of aerosols produced by asymptomatic individuals during breathing and speaking (1–3). Aerosols can accumulate, remain infectious in indoor air for hours, and be easily inhaled deep into the lungs. [1]

34.    Dr. Prather also found that because it transmits as an aerosol, COVID-19 can physically contaminate surfaces and be transmitted through contact with those infected surfaces.

Respiratory droplets will undergo gravitational settling faster than they evaporate, contaminating surfaces and leading to contact transmission. Smaller aerosols (≤5 μm) will evaporate faster than they can settle, are buoyant, and thus can be affected by air currents, which can transport them over longer distances. Thus, there are two major respiratory virus transmission pathways: contact (direct or indirect between people and with contaminated surfaces) and airborne inhalation.[2]

35.    The World Health Organization corroborated Dr. Prather's research, finding that COVID-19 had at least eight different confirmed modes of transmission, including contact, droplet, airborne, and fomite (i.e., infected surfaces). When droplets expelled by infected individuals land on and contaminate a surface, the surface becomes a viable transmitter of COVID-19 "for periods ranging from hours to days, depending on the ambient environment (including temperature and humidity) and the type of surface."[3]

36.    In an interview with *America* magazine on May 26, Dr. Anthony Fauci, who leads the National Institute of Allergy and Infectious Diseases, referenced aerosol transmission in churches. "When you sing, the amount of droplets and aerosol that come out is really, in some respects, scary," Dr. Fauci said.[4]

---

[1] https://science.sciencemag.org/content/early/2020/05/27/science.abc6197.

[2] *Id.*

[3] https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

[4] https://www.americamagazine.org/faith/2020/05/27/dr-anthony-fauci-catholic-churches-masks-communion-covid-coronavirus

37. Similarly, another scientist, Dr. Lidia Morawska told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[5]

38. The World Health Organization, in its guidance on wearing masks, recognized that COVID-19 can transmit person-to-person "directly by contact with infected people, or indirectly by contact with surfaces in the immediate environment or with objects used on or by the infected person," with the primary mode of transmission "via respiratory droplets and contact routes."[6]

39. Other studies have shown that in addition to water droplets, COVID-19 is transmitted through aerosols. A study of hospitals in Wuhan, China, found COVID-19 in aerosols further than 6 feet, and up to 13 feet, from patients with higher concentrations detected in more crowded areas.[7] Those authors found evidence of the virus on floors, trash bins, air vents, and other places. Estimates using an average viral load for COVID-19 indicate that one minute of loud speaking could generate more than 1000 virion-containing aerosols.[8]

40. Other studies have used invisible fluorescent tracers — decoy germs that glow under black light — to track how germs are spread from surfaces. In one series of experiments, 86 percent of workers were contaminated when spray or powder tracers were put on commonly touched objects in an office. When tracer powder was put on a bathroom faucet and exit doorknob, the glowing residue was found on employees' hands, faces, phones and hair. From a shared cell phone, the tracer spread to desktop surfaces, drinking cups, keyboards, pens and doorknobs. A

---

[5] https://www.nature.com/articles/d41586-020-00974-w
[6] World Health Organization, Advice on the Use of Masks in the Context of COVID-19, at 1-2 (June 5, 2020).
[7] Y. Liu et al., Nature (2020). doi:10.1038/s41586-020-2271-3pmid:32340022.
[8] V. Stadnytskyi, C. E. Bax, A. Bax, P. Anfinrud, Proc. Natl. Acad. Sci. U.S.A. 202006874 (2020). doi:10.1073/pnas.2006874117pmid:32404416.

contaminated copy machine button added a trail of fluorescent finger prints transferred to documents and computer equipment. And just twenty minutes after arriving home from the office, the decoy germs carried by the employee were found on backpacks, keys and purses, and on home doorknobs, light switches, countertops and kitchen appliances.[9]

41.     A recent study of an outbreak from a restaurant in China concluded that the transmission in that case was likely prompted by air-conditioned ventilation.[10]  In that case, from January 26 through February 10, 2020, an outbreak of COVD-19 infected ten persons from three families (families A–C) who had eaten at the same air-conditioned restaurant in Guangzhou, China. The only known source of exposure for the affected persons in families B and C was patient A1 at the restaurant. The families were seated more than a meter apart, and yet 10 people became ill who were at the restaurant that day. The authors concluded that the virus likely spread through the restaurant's air-conditioning system.

42.     A 2014 analysis published in the scientific journal *Clinical Infectious Diseases* investigated an outbreak of a SARS-CoV virus in an apartment complex where the residents were not in close contact.[11] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[12]

43.     The fact that COVID-19 can spread through the aerosols, on surfaces, and through the air has made the ease of transmission of the virus especially alarming. It means the virus can

---

[9] Kelly A Reynolds, Pamela M Watt, Stephanie A Boone & Charles P Gerba (2005) Occurrence of bacteria and biochemical markers on public surfaces, International Journal of Environmental Health Research, 15:3, 225-234, DOI: 10.1080/09603120500115298.

[10] Lu J, Gu J, Li K, Xu C, Su W, Lai Z, et al. COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020. Emerg Infect Dis. 2020 Jul [date cited]. https://doi.org/10.3201/eid2607.200764.

[11] https://academic.oup.com/cid/article/58/5/683/365793

[12] *Id.*

spread to people who are not close to each other, who occupy the same space at different points in time, or who merely breath the same air or touch common surfaces at different periods of time.

44.    COVID-19 therefore has and continues to pose a direct threat of physical loss or physical damage to property. Moreover, it has and continues to render property unsafe.

**B.  The COVID-19 Closure Orders**

45.    State and local governments have determined that, in light of these dangers of physical transmission and in light of direct damage to property at locations other than plaintiff's property, the Closure Orders were required.

46.    On March 11, 2020, the WHO declared COVID-19 a global pandemic. And President Trump announced he would block travelers from continental Europe. On March 12, 2020, an influential scientific study posted on the CDC's website found that surface transmission of the virus was the most likely explanation for an outbreak at a Chinese shopping mall.[13] In that study, the researchers studied an outbreak in January, when seven workers who shared an office in a shopping mall became ill after one of their co-workers returned from Wuhan. Public health officials tracked two dozen more sick people, including several women who had shopped at the mall, as well as their friends. None of them had come into contact with the sick office workers. The researchers concluded that "its findings appear to indicate that low intensity transmission occurred without prolonged close contact in this mall; that is, the virus was spread by indirect transmission." One leading explanation was that the virus was "spread via fomites" (i.e., infected surfaces), such as "elevator buttons or restroom taps." Virus aerosolization was also suspected.

---

[13] https://www.nc.cdc.gov/eid/article/26/6/20-0412_article.

47.    On March 15, 2020, the CDC issued guidance restricting gatherings to less than 50 people. In the guidance, the CDC recognized the danger of spreading the virus through surface transmission, and through the air, advising people to "clean frequently touched surfaces and objects daily," to cover "coughs and sneezes," and to "routinely clean and disinfect surfaces and objects that are frequently touched."

48.    On March 7, 2020, New York Governor Andrew Cuomo declared a state of emergency due to the spread of COVID-19 in New York State. Three days later, Governor Cuomo ordered schools, churches, and other public spaces closed in New Rochelle as part of a one-mile "containment area" for the state's first COVID-19 hotspot. Schools in at least six other counties would close by the end of that week, with New York City shuttering Broadway theaters on March 12, 2020 and schools from Monday, March 16, 2020.

49.    On March 14, 2020, in Monroe County—where one of Plaintiff's covered stores is located—County Executive Adam J. Bello issued a State of Emergency Proclamation.[14] A few hours later, Bello ordered all 22 public school districts within the county closed indefinitely.[15]

50.    On March 15, 2020, in Erie County, the most populous county in the state outside the New York City metropolitan area, and where three of Plaintiff's seven covered stores are located, County Executive Mark Poloncarz issued an indefinite State of Emergency Declaration and directed the county government "to take whatever steps necessary to protect life and **property**" from the threat COVID-19 posed (emphasis added).[16] The same day, Poloncarz ordered all county

---

[14] Adam J. Bello, Local State of Emergency Proclamation, March 14, 2020, *available at* https://twitter.com/CountyExecBello/status/1238828875381116931/photo/1.
[15] https://www.monroecounty.gov/File/2020-03-14%20School%20Closings.pdf
[16] https://www2.erie.gov/health/sites/www2.erie.gov.health/files/uploads/pdfs/EmergencyOrderforStateofEmergency DeclarationCOVID19.pdf.

schools closed effective immediately.[17]  Over the last several months, it is likely that COVID-19 attached to the surfaces and air of the insured premises, and surrounding property, by persons infected with COVID-19.

51.    On March 17, 2020, New York City Mayor Bill de Blasio issued an executive order banning ride-share services in which he explicitly noted that "the virus **physically is causing property loss and damage**" and that the "reduction of opportunities for the person-to-person transmission of COVID-19 in meetings and other gatherings [was] necessary" (emphasis added).[18]

52.    Even in parts of the state that still had no confirmed COVID-19 cases, officials acted to fight the immediate threat COVID-19 posed. For instance, on March 14, 2020, in Onondaga County—where one of Plaintiff's covered stores is located—the County Executive declared a State of Emergency because "the public safety [wa]s sufficiently imperiled" by COVID-19.[19] The next day, Niagara County—where Plaintiff is both headquartered and maintains one of its covered locations—declared a state of emergency and ordered all schools to be closed through April 20, 2020. And on March 16, 2020, in Chautauqua County—where another of Plaintiff's covered stores is located—the County Executive declared a State of Emergency, recommending schools close by March 18 and that everyone "should [] limit our public interaction" by "avoiding crowded spaces [and] limiting trips to the store."[20]

53.    On March 20, 2020, Governor Cuomo announced that effective at 8pm on March 22, the entire state of New York would enter a "PAUSE Program" whereby all non-essential

---

[17]https://www2.erie.gov/health/sites/www2.erie.gov.health/files/uploads/pdfs/EmergencyOrderforSchoolClosure.pdf
[18] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-101.pdf.
[19] J. Ryan McMahon, II, Proclamation of Emergency in and for Onondaga County, March 14, 2020.
[20] https://chqgov.com/county-executive/news/county-executive-wendel-declares-state-emergency-chautauqua-county

businesses would have to either close or switch exclusively to a work-from-home model. Bars were closed, with restaurants allowed to remain partially open for takeout orders only. Personal care facilities, such as hair salons and barbershops, were ordered closed, as were retail shopping malls, gyms, and movie theaters.[21] This order was supplemented by local orders from county officials.[22]

54. On April 16, 2020, Governor Cuomo extended the PAUSE Program on a statewide basis through May 15, 2020.[23]

55. Three weeks later, On May 7, 2020, Governor Cuomo again extended the PAUSE Program through June 6, 2020, although he would allow counties that met specific COVID-19-related thresholds to begin a four-phase reopening process on May 15.[24]

56. As of April 1, 2020, at least forty-four states and local governments across the country issued orders entirely closing restaurants for in-person dining; at least five more allowed only limited on-site service; and one limited gatherings to no more than ten people.[25] By April 15, 2020, at least forty-three states had issued orders closing or severely limiting the operation of non-essential businesses, and at least forty-seven states had issued orders prohibiting restaurants from offering dine-in services, with other states either limiting on-site service or prohibiting gatherings of more than ten people.[26] The purpose of these orders was to try to mitigate and slow the spread

---

[21] https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.8.pdf

[22] *E.g.*, http://www.ongov.net/communications/press/documents/Local%20Order%20of%20OC%20Executive%20-%20No.%209%209%20Criminal%20Enforcement.pdf ("[A]ll businesses and not-for-profit entities within Onondaga County shall reduce the in-person workforce at any locations by 100%.").

[23] https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.18.pdf

[24] https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.31.pdf

[25] https://web.archive.org/web/20200401202749/https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/

[26] https://web.archive.org/web/20200415130206/https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/

of COVID-19.

57.    Every state has issued emergency declarations to slow the spread of COVID-19, with many states reenacting or re-extending emergency declarations in June or July 2020 as COVID-19 cases accelerated in much of the country. Twenty-two states paused or reversed their reopening process, with a further eleven states still partially closed.[27] Moreover, even in places that have reopened, businesses remain constantly threatened with further closures due to COVID-19 contamination brought in by infected customers or employees.

58.    The situation in a given location can and does change rapidly, as evidenced both by the states that have reversed reopening, as well as by other countries, such as Australia, Croatia, and Israel, that after having COVID-19 under control saw a second wave in July 2020 that exceeded the first wave in March and April 2020.

59.    The Closure Orders also explicitly acknowledge that COVID-19 can spread in and damage physical property, including surfaces. For example, the March 17, 2020 New York City order discussed above explicitly noted that "the virus physically is causing property loss and damage." Moreover, Closure Orders inside and outside New York, as well as federal government guidance, specifically recognize that COVID-19 endangers property, and can be physically spread by touching infected surfaces and through the air.

60.    The global pandemic relating to the COVID-19 has had a tremendous impact throughout the world, leading to more than 140,000 deaths in the United States alone to date.[28]

---

[27] https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html
[28] CENTERS FOR DISEASE CONTROL AND PREVENTION, CORONAVIRUS DISEASE 2019 (COVID-19), http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 22, 2020).

61.  death total of 151 people per 100,000 residents is second only to neighboring New Jersey.[29]

62.  The COVID-19 pandemic has had a devastating effect on the United States, leading to the involuntary shutdown of many businesses across the country, including all seven of Plaintiff's New York locations. Some estimates have suggested that several hundred thousand of the small businesses in the United States have shut down permanently due to the Coronavirus.

63.  As a result of the Closure Orders, Reeds closed all its New York stores from March 22, 2020 to June 2, 2020. The closure of its retail jewelry stores due to COVID-19 resulted in a substantial loss of sales. Reeds estimates that forced closure of the Insured Locations resulted in a loss of sales in excess of $3 million, including over $1.1 million in each of April and May 2020.

64.  Although Reeds has since reopened its locations, there remains an ongoing and real threat that one or more of its locations will become subject to a new Closure Order, or have to temporarily shut down due to contamination from COVID-19.

**C.  The Cincinnati Business Interruption Policies**

65.  In order to protect itself against unexpected risks like COVID-19, plaintiff purchased the Policy from defendant. The policy was in effect from August 2019 through August 2020. Plaintiff performed all obligations under the policy and paid all premiums required by the Policy.

66.  Plaintiff is the named insured under the Policy, which remains in force and effect.

---

[29] https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?hpid=hp_hp-top-table-main_gfx-virus-tracker%3Ahomepage%2Fstory-ans&itid=hp_hp-top-table-main_gfx-virus-tracker%3Ahomepage%2Fstory-ans

67. Defendant is the insurer of the Policy and policies held by the other members of the Class.

68. Generally, under business interruption policies like those issued by defendant to plaintiff and Class members, the policies provide coverage for all risks to property, unless specifically excluded.

69. The Policy form at issue does not exclude or limit coverage for losses from viruses or communicable diseases like COVID-19 in these circumstances. Nor does it contain a pandemic exclusion clause.

70. The risk of a virus like COVID-19 was foreseen, and foreseeable to, defendant. The Insurance Services Office ("ISO"), an organization that provides policy writing services to insurers, sent the following statement to state insurance regulators in 2006, in connection with the submission of an exclusion of loss "due to disease-causing agents such as viruses and bacteria":

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

71. Plaintiff's Policy contains no such applicable virus exclusion, despite its availability since 2006. Nor does plaintiff's Policy contain an exclusion for "pandemics," "communicable disease," or anything similar.

72. Moreover, to mitigate further losses, as required by the Policy, plaintiff suspended operations when the Closure Orders and government officials announced that COVID-19 posed a

risk of causing further physical property damage and loss.

73. The Policy is composed of several distinct forms. Policyholders can pay for optional forms and coverages, but the forms themselves are standardized.

74. The Policy contains several types of additional coverages that provide coverage in these circumstances. The following additional coverages all appear in the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM (INCLUDING SPECIAL CAUSES OF LOSS)" which is a standardized form with form number "FM 101 05 16."

75. Defendant agreed to provide coverage from an interruption to business caused by an action, such as an order, from a **"Civil Authority."** Specifically, defendant agreed to pay for loss of business income in the following circumstances:

> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises," provided that both of the following apply:
>
> (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
> (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

76. The term "Covered Causes of Loss" is defined to mean "direct 'loss,' unless the 'loss' is excluded or limited" by the policy. "Loss" is defined to mean "accidental physical loss or accidental physical damage." The Closure Orders were taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, and have caused plaintiff to have lost the use of its premises for their intended purpose, and no exclusion applies to these losses. Plaintiff's losses are covered under the Policy, including under the "Civil Authority" coverage. Access has been restricted to the Covered Property, and

immediate surrounding area, due to the Closure Orders. Plaintiff has suffered approximately $1 million per month in lost "Business Income" because it suspended operations of its business due to COVID-19 and the Closure Orders.

77. Defendant is also obligated to pay for actual loss of **"Business Income"** sustained "due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension' must be caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss.'" "Business Income" means "[n]et income (net profit or loss before income taxes" that would have been earned or incurred" as well as "[c]ontinuing normal operating expenses sustained, including payroll. Coverage lasts during the "period of restoration" – beginning at the "time of direct 'loss'" and running through the earlier of the date the property is repaired or business is resumed at a new permanent location. A "slowdown or cessation" of business activities constitutes a "suspension" under the Policy. Plaintiff has suffered approximately $1 million per month in lost Business Income because of the necessary suspension of operations of its business due to the Closure Orders and COVID-19.

78. Defendant also agreed to pay for **"Extra Expense."** Extra Expenses are expenses to "avoid or minimize 'suspension' of business and to continue 'operations,'" including to repair or replace property. Plaintiff suspended operations due to COVID-19 and the Closure Orders and has spent money to break-down and clean the property for COVID-19 in order to minimize the suspension of business. Likewise, after plaintiff was permitted to resume business and end the suspension, plaintiff has suffered "Extra Expenses" to restore the property and prevent further damage to the property from the ongoing COVID-19 pandemic.

79. Losses caused by COVID-19 and the related state and local Closure Orders are covered by these provisions of defendant's Policy. Specifically, plaintiff's operations have been

suspended, and it has lost revenue and business opportunities because of COVID-19, the Closure

Orders, and because it has been unable to serve its customers in the premises of its business. Losses

related to the Closure Orders and COVID-19 are a "Covered Cause of Loss" under the policy, and

are covered under each of the foregoing provisions of the policy.

80.   Plaintiff submitted a claim to defendant for coverage under the Policy, but defendant

has wrongfully denied plaintiff's claim and requested information not required purportedly to

evaluate the claim in order to further its unwarranted plan to effectuate delay and denial of

coverage. Cincinnati denied the claim by letter, stating that "coverage is unavailable for the

claimed loss" because there was no "direct physical damage [] to property at the covered premises."

81.   The Policy contains no virus exclusion. It does, instead, contain a "Pollutants"

exclusion (Form FM 101 05 16), which Cincinnati cited to as one reason to deny coverage, but by

its terms this exclusion applies to industrial-type pollutants, not viruses, and it does not once

mention "viruses" or pandemics at all. Cincinnati identified no other exclusion in denying

coverage.

## <u>CLASS ACTION ALLEGATIONS</u>

82.   Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4),

plaintiff brings this action on behalf of itself and all others similarly situated, and seeks to represent

the following nationwide classes:

>   b.   **Nationwide Declaratory and New York subclass and Injunctive Relief Class.**
>   All policyowners subject to a Closure Order that are insured by one of the
>   defendant's policies which contains **Business Income, Extra Expense, and Civil**
>   **Authority** coverage on terms similar to the plaintiff's Policy ("collectively, the

Policies") which were in effect at any time during the COVID-19 pandemic.

     c. **Nationwide Breach of Contract Class.** All policyholders of defendant who made a claim and were denied coverage under one of defendant's Policies due to COVID-19.

     d. **New York Subclass.** All policyholders who purchased one of defendant's Policies in New York and were denied coverage due to COVID-19.

Excluded from the Classes are defendant; any of the officers, directors, or employees of the defendant; and the legal representatives, successors, and assigns of the defendant.

     83. Plaintiff's Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as alleged more fully herein.

     84. **Numerosity**. Plaintiff does not know the exact number of Class members, as such information is in the exclusive control of the defendant. However, COVID-19 has impacted thousands of businesses across the country and defendant is a nationwide insurer which, on information and belief, issued thousands of Policies with the relevant provisions both in New York and nationwide. Consequently, members of each Class are so numerous that individual joinder of all Class members is impracticable. Class members and New York Subclass members may be informed of the pendency of this class action through recognized, Court-approved notice dissemination methods, including direct mail or other means based on defendant's records of its policyholders.

     85. **Commonality**. There are predominant questions of fact and law common to the Classes. These include, without limitation, the following:

A) Do the Policies cover losses resulting from the Closure Orders and COVID-19?

B) Do the Policies cover losses resulting from state and local Closure Orders requiring the suspension or reduction in business?

C) Has defendant wrongfully denied claims for losses resulting from COVID-19 and/or the Closure Orders?

D) Does the **Business Income** coverage of the Policies cover losses due to COVID-19 and the Closure Orders?

E) Does the **Extra Expense** coverage of the Policies cover losses due to COVID-19 or the Closure Orders?

F) Does the **Civil Authority** coverage of the Policies cover losses due to COVID-19 and the Closure Orders issued by state and local governments?

G) Has defendant breached its Policies by refusing to cover COVID-19 related losses?

H) Has defendant breached its obligation of good faith and fair dealing in denying coverage under its Policies through standard summary claims denial letters without conducting any investigation?

I) Are Class members entitled to reasonable attorneys' fees and expenses?

86. **Predominance.** The common questions predominate over any individual issues in the action. Thousands of businesses are impacted by defendant's denial of coverage for COVID-19 losses and their claims arise from a common factual predicate, which is the nationwide shutdown and suspension of activities due to the virus and Closure Orders. On information and belief, defendant has denied these COVID-19 claims in form letters that give substantially the same,

classwide reasons for the denial of coverage. The Policies are written on form contracts that are common to the Classes, and the breach will be common to the Classes.

87. **Typicality.** Plaintiff's claims are typical of those of the Classes because plaintiff and other Class members have the same or similar policy provisions, their losses stem from COVID-19 and the Closure orders, they are similarly situated with respect to defendant's reasons for denial of coverage, and their claims arise from the same legal theories.

88. **Superiority**. A class action is the superior method for the fair and efficient adjudication of this controversy. Defendant has acted on grounds applicable to the Classes and New York Subclass. Individualized litigation would create a risk of inconsistent and varying adjudications, would establish incompatible standards of conduct for defendant, and substantially impairs or impedes the ability of Class members to protect their interests, given that individual claims may be too expensive to litigate.

89. **Declaratory Relief – Rule 23(b)(2)**. Defendant has acted or refused to act on grounds applicable to the Classes and New York Subclass, making injunctive and declaratory relief as described below appropriate. Specifically, defendant has denied COVID-19 claims on similar grounds, under similar Policies, and in similar factual circumstances.

90. **Adequacy**. Plaintiff is an adequate representative of the Classes and New York Subclass because it is a member of the Classes and Subclass and its interests do not conflict with the interests of those it seeks to represent. Plaintiff's counsel, who have extensive experience prosecuting complex class litigation, along with plaintiff, will fairly and adequately protect the interests of the Classes.

91. **Issue Class and Modification of Class Definitions and Creation of Subclasses**. In

the alternative, plaintiff reserves the right to seek certification of one or more common issues pursuant to Rule 23(c)(4), and to modify the class definition, including by seeking certification of subclasses for policyholders with each of the following Policy provisions: **Business Income, Extra Expense, and Civil Authority,** or other subclasses as may be appropriate or necessary.

## FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT – BUSINESS INCOME

**(On behalf of Nationwide Breach of Contract Class and New York Subclass)**

92.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

93.     Plaintiff and the Class purchased property coverage policies from defendant.

94.     Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

95.     The Policies are enforceable contracts between the defendant and plaintiff and Class members.

96.     Plaintiff and the Class have sustained a loss under the Business Income coverage in the Policies due to the COVID-19 virus and Closure Orders.

97.     Defendant has wrongfully refused to pay the claim for Business Income, and instead has requested information not necessary to determine coverage.

98.     Defendant has denied claims for Business Income related to COVID-19 on a uniform and classwide basis, in breach of the Policies.

99.     As a direct and proximate result of defendant's breaches, plaintiff and the members of the Class have sustained damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

## DECLARATORY AND INJUNCTIVE RELIEF – BUSINESS INCOME

**(On behalf of Nationwide Declaratory Judgment
and Injunctive Relief Class and New York Subclass)**

100. The preceding paragraphs are incorporated by reference as if fully alleged herein.

101. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

102. An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about April 29, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter denying coverage and seeking information that is not reasonably necessary to evaluate plaintiff's claim. Defendant is in breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

103. Moreover, upon information and belief, defendant has denied its insureds' claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

104. Plaintiff seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the conduct of defendant alleged above to be unlawful and in material breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

  a. The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

  b. Cincinnati is obligated to pay policyowners the full amount of the Business Income losses incurred and to be incurred in connection with COVID-19 and the Closure

Orders during the period of restoration and the necessary suspension of their business operations.

105.    Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Business Income Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

## THIRD CLAIM FOR RELIEF

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF – EXTRA EXPENSE

**(On behalf of Nationwide Declaratory Judgment and Injunctive Relief Class and New York Subclass)**

106.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

107.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

108.    An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about April 29, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter denying coverage and seeking information that is not reasonably necessary to evaluate its claim. Defendant is in breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

109.    Moreover, upon information and belief, defendant has denied claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

110.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the conduct of defendant alleged above to be in

breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

    a. The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

    b. Cincinnati is obligated to pay policyowners the full amount of the Extra Expense losses incurred and to be incurred in connection with COVID-19 and the Closure Orders during the period of restoration and the necessary suspension of their businesses.

111. Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Extra Expense Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

## FOURTH CLAIM FOR RELIEF

### BREACH OF CONTRACT – EXTRA EXPENSE

**(On behalf of Nationwide Breach of Contract Class and New York Subclass)**

112. The preceding paragraphs are incorporated by reference as if fully alleged herein.

113. Plaintiff and the Class purchased property coverage policies from defendant.

114. Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

115. The Policies are enforceable contracts between the defendant and plaintiff and Class members.

116. Plaintiff and the Class have sustained a loss under the Extra Expense Coverage in the Policies due to the COVID-19 virus and Closure Orders.

117. Defendant has refused to pay the claim for Extra Expense, and instead has requested information not necessary to determine coverage.

118. Defendant has denied claims for Extra Expense related to COVID-19 on a uniform and classwide basis, in breach of the Policies.

119.    As a direct and proximate result of defendant's breaches, plaintiff and the Class have sustained damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### DECLARATORY AND INJUNCTIVE RELIEF – CIVIL AUTHORITY

**(On behalf of Nationwide Declaratory Judgment and
Injunctive Relief Class and New York Subclass)**

120.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

121.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

122.    An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about April 29, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter wrongfully denying coverage and seeking information that is not reasonably necessary to evaluate plaintiff's claim. Defendant is in breach of its obligations under the Policy by refusing to provide coverage despite having sufficient information to evaluate and pay plaintiff's claims.

123.    Moreover, upon information and belief, defendant has denied claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

124.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the conduct of defendant alleged above to be unlawful and in material breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

a. The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

     b.   Cincinnati is obligated to pay policyowners the full amount of the Civil Authority losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary suspension of their businesses.

125.    Plaintiff further seeks an injunction enjoining defendant (1) from continuing to engage in breaching its coverage obligations under the Civil Authority Coverage Extension; and (2) ordering defendant to comply with the terms of the Policies regarding to coverage decisions.

### SIXTH CLAIM FOR RELIEF

### BREACH OF CONTRACT – CIVIL AUTHORITY

### (On behalf of Nationwide Breach of Contract Class and New York Subclass)

126.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

127.    Plaintiff and the Class purchased property coverage policies from defendant.

128.    Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

129.    The Policies are enforceable contracts between the defendant and plaintiff and Class members.

130.    Plaintiff and the Class have sustained a loss under the Civil Authority Coverage in the Policies due to the COVID-19 virus and Closure Orders.

131.    Defendant has refused to pay the claim for Civil Authority coverage, and instead has requested information not necessary to determine coverage.

132.    Defendant has denied claims for Civil Authority related to COVID-19 on a uniform and classwide basis, in breach of the Policies.

133.    As a direct and proximate result of defendant's breaches, plaintiff and the Class have sustained damages in an amount to be determined at trial.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF –
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(On behalf of New York Subclass)**

134.  The preceding paragraphs are incorporated by reference as if fully alleged herein.

135.  The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

136.  An actual controversy has arisen and now exists between plaintiff and the Class, on the one hand, and defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. On or about April 29, 2020, plaintiff requested coverage for COVID-19-related losses through its agent. Defendant responded with a letter wrongfully denying coverage and seeking information that is not reasonably necessary to evaluate plaintiff's claim. Defendant is in breach of its obligations under the Policy by refusing to reasonably investigate provide coverage for a claim despite having sufficient information to evaluate and pay plaintiff's claims.

137.  Moreover, upon information and belief, defendant has denied claims related to Closure Orders and COVID-19 on a uniform and classwide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim for coverage.

138.  Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the conduct of defendant alleged above to be unlawful and in material breach of the Policies so that future controversies may be avoided. Specially, plaintiff seeks a declaration that:

    a.  Defendant has an obligation under New York law to in good faith investigate business income loss and other related claims submitted by class members in connection with COVID-19 and the Closure Orders;

    b.  The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under plaintiff's and class members' Policies; and

      c.    Cincinnati is obligated to pay policyowners the full amount of their covered losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary suspension of their businesses.

139.    Plaintiff further seeks an injunction enjoining defendant from continuing to engage in breaching its covenant of good faith and fair dealing.

## EIGHTH CLAIM FOR RELIEF

### BREACH OF CONTRACT – IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (On behalf of New York Subclass)

140.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

141.    Plaintiff and the Class purchased property coverage policies from defendant.

142.    Plaintiff and the Class substantially performed their obligations under the Policies including giving defendant notice of the claim. Alternatively, defendant has waived any conditions, terms or defenses to coverage.

143.    The Policies are enforceable contracts between the defendant and plaintiff and Class members.

144.    Plaintiff and the Class have sustained a loss under one or more provisions of the insurance contract.

145.    Defendant has denied claims related to COVID-19 on a uniform and classwide basis, without any investigation, and has therefore also refused to pay the claims.

146.    By refusing to investigate and pay claims submitted by the Class, defendant has breached its implied covenant of good faith and fair dealing.

147.    As a direct and proximate result of defendant's breaches, plaintiff and the Class have sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Reeds Jewelers of Niagara Falls, Inc., individually and on behalf of all others similarly situated, requests relief against defendant as follows:

1. That the court enter an order certifying the classes, appointing plaintiff as a representative of the classes, appointing plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class;

2. For a judgment against defendant for the claims for relief alleged against it;

3. For monetary damages in an amount to be determined at trial;

4. For a judicial declaration that the policy of insurance extends coverage from direct physical loss and/or from a civil authority shut-down due to a global pandemic virus;

5. For punitive damages;

6. For all pre-judgment and post-judgment interest at the maximum rate allowable by law;

7. For plaintiff's attorney's fees;

8. For plaintiff's costs incurred; and

9. For such further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this complaint so triable.

Respectfully submitted,

/s/ *Randolph H. Freking*
Randolph H. Freking (0009158)
FREKING MYERS & REUL LLC
600 Vine Street, 9th Floor
Cincinnati, OH 45202
Phone: (513) 721-1975
randy@fmr.law

William R.H. Merrill (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
bmerrill@susmangodfrey.com

Seth Ard (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Phone: (212) 336-8330
sard@susmangodfrey.com

Steven Sklaver (*pro hac vice* to be filed)
Marc M. Seltzer (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
ssklaver@susmangodfrey.com
mseltzer@susmangodfrey.com

John Scott Black (*pro hac vice* to be filed)
Richard D. Daly (*pro hac vice* to be filed)
Melissa Wooden Wray (*pro hac vice* to be filed)
DALY & BLACK, P.C.
2211 Norfolk Street, Suite 800
Houston, Texas 77098
Tel: (713) 655-1405
jblack@dalyblack.com
rdaly@dalyblack.com
mwray@dalyblack.com
ecfs@dalyblack.com (service)

**ATTORNEYS FOR PLAINTIFF
REEDS JEWELERS OF
NIAGARA FALLS, INC.**